UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

AMERICAN INTERNATIONAL GROUP, INC.
AMENDED AND RESTATED EXECUTIVE
SEVERANCE PLAN,

        Plaintiff-Counter-Defendant,

   -and-

AMERICAN INTERNATIONAL GROUP, INC.
COMPENSATION AND MANAGEMENT
RESOURCES COMMITTEE,

        Third-Party Defendant,

   -against-

STEVEN GUTERMAN,

        Defendant-Counter-Plaintiff-
        Third-Party-Plaintiff.

------------------------------------------------------x



No. 10 Civ. 9390 (LTS)(FM)

## MEMORANDUM OPINION AND ORDER

        In this action, Plaintiff American International Group, Inc. Amended and Restated Executive Severance Plan ("ESP" or "Plan") seeks a declaratory judgment that Defendant Steven Guterman ("Guterman") is ineligible to receive severance benefits under the Plan. Guterman counter-claims against the ESP, seeking severance benefits under the Plan pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Guterman also brings what he has denominated as a cross-claim against the Plan's administrator, the American International Group, Inc. Compensation and Management Resources Committee ("CMRC" or "Plan Administrator"), also seeking an award of Plan

benefits. The Court has jurisdiction of the ESP's declaratory judgment action pursuant to 28 U.S.C. §§ 1331, 2201-02 and of Guterman's benefit claims pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

The ESP and the CMRC now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] The Court has considered thoroughly the parties' submissions. For the following reasons, the motion for summary judgment will be granted in its entirety and Guterman's claims will be dismissed.

## BACKGROUND

The following material facts are undisputed unless otherwise indicated.[2] The ESP is an ERISA-governed employee benefit plan adopted by American International Group, Inc. ("AIG") and maintained to provide severance payments to a select group of highly compensated employees of AIG's subsidiaries. (Pl.'s Rule 56.1 Statement ("ESP 56.1 Stmt") ¶ 18.) The ESP gives the Plan Administrator discretionary authority to determine an employee's eligibility for benefits and to interpret the terms of the plan. (Id. ¶ 24.)

In 2009, Guterman was employed as the Senior Managing Director, Head of Global Business Development, of AIG Global Asset Management Holding Corp. ("AIG Investments"). (Id. ¶ 1.) Guterman was also employed as a Vice President of AIG. (Id. ¶ 2.)

---

[1] The ESP initiated the summary judgment practice prior to the interposition of Guterman's claim against the CMRC; the reply brief in support of the motion was filed jointly by the ESP and the CMRC.

[2] Facts characterized as undisputed are identified as such in the parties' statements pursuant to Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory, contrary factual proffer. Citations to the parties' respective S.D.N.Y. Local Civil Rule 56.1 statements ("ESP 56.1 Stmt") and responses thereto ("Guterman 56.1 Resp. Stmt") incorporate by reference citations to the underlying evidentiary submissions.

Guterman was, at all times relevant, an eligible employee under the terms of the ESP. (Guterman Countercl. ¶ 9.) The Plan provides that eligible employees may receive severance benefits in the event of certain "Covered Termination[s]." (ESP 56.1 Stmt ¶ 19.) For Vice Presidents of AIG, the term "covered terminations" specifically excludes "resignation (including any resignation that an Eligible Employee may assert was a constructive discharge)." Vice Presidents who resign are thus ineligible to receive severance benefits. (Id. ¶ 20.) For Senior Vice Presidents and above, covered terminations include resignation for "Good Reason," a term defined to include "a diminution in the Eligible Employee's duties or responsibilities . . . title or offices . . . [or] annual target bonus opportunity." (Compl., Ex. A ("ESP Plan")) §§ IV(A)(2), IV(K)("Good Reason")(1)-(4).)

In 2009, AIG restructured the segment of its business in which Guterman was employed, renaming the segment "Bridge." (Guterman 56.1 Stmt ¶¶ 3, 4.) On September 10, 2009, Hans Danielsson ("Danielsson"), Guterman's supervisor, and Win Neuger ("Neuger"), the CEO of Bridge, told Guterman that his unit was to be divided into three free-standing divisions, each of which would be run by a separate individual who would report directly to the Executive Committee. (Id. ¶¶ 4-5.) Danielsson and Neuger offered Guterman leadership of one of the three new divisions as Head of Retail Sales. (Id. ¶ 5.) According to Guterman, when he asked what his duties and compensation would be, neither Danielsson or Neuger knew. (Id.) The next day, Danielsson told Guterman that his annual salary in the new position would remain $500,000, but that his incentive compensation would be lower than before. (Id. ¶ 6.)

Guterman alleges that, on September 14, 2009, he told Danielsson and Neuger that he felt the Head of Retail Sales position was redundant and not in line with the stated goals of Bridge's restructuring. (Id. ¶ 8.) Guterman also alleges that he said that he viewed the change

as a reduction-in-force, and reminded Neuger that he was covered under the ESP. (Id.) According to Guterman, Neuger said he would have to check with Human Resources about Guterman's ESP coverage. (Id.) The next day, Connie Miller ("Miller"), Bridge's Head of Human Resources, told Guterman that he would not be eligible for ESP benefits if he declined the Head of Retail Sales position. (Id. ¶ 9.)

According to Guterman, he and Miller communicated on September 16 regarding his eligibility for ESP benefits. Guterman alleges that, in these conversations, Miller told him that, contrary to her previous statement, he would be eligible for ESP benefits of approximately $800,000, even if he declined the Head of Retail Sales role. (Id. ¶ 10-11.) Miller, according to Guterman, said that the elimination of his previous position would be treated as a termination and, moreover, that Miller personally believed that the loss of his previous position was a termination. (Id. ¶ 10.) Guterman indicates that he disputed Miller's $800,000 estimate, arguing that his benefit calculation should be based on a higher overall compensation level. (Id. ¶ 11.) Guterman alleges that he subsequently asked Miller for a written clarification of how his ESP benefits would be calculated, and Miller told him she would confirm the details with Neuger. (Id. ¶¶ 11, 13.)

At the close of business that day, Neuger emailed all of the Bridge staff, informing them that Guterman had "elected to leave the firm." (Id. ¶ 12.) On September 17, Guterman emailed Neuger, stating that he had "neither resigned nor elected to leave the firm" and emphasizing that "there is no mutual agreement for a voluntary separation, nor have I been notified that I have been terminated." (Id. ¶ 14.) In response, Neuger called Guterman and told him that his options were to either accept the position of Head of Retail Sales or resign. (Id. ¶ 15.) According to Guterman, he asked for a written description of the job he was being offered,

which he could then either accept or decline. (Id.) At the close of business on September 17, Miller emailed Guterman stating, in relevant part, that

> your job -- assuming you wish to stay with the company -- has changed. . . . We issued the announcement yesterday because we understood from you that you did not want to stay with the company . . . As Win [Neuger] and I have repeatedly indicated, we very much want you to say [sic] with the company in the new role. Please let us know, by close of business tomorrow, whether you are acceptable to working with the company in that new position.

(Id. ¶ 16.) Guterman alleges that, in addition to his written communication with Miller on September 17, he also had a conversation with her that day during which she told him that "AIG would like to have press that it denied a senior executive severance." (Id. ¶ 30.)

The next day, September 18, Guterman emailed Miller, requesting four additional days – i.e., until Tuesday of the following week, September 22 – to decide whether to accept the new position, requesting a written document detailing his pension severance benefits, and stating that he was "disturbed to see my separation from Bridge incorrectly characterized in Win's email as 'Steve Guterman has elected to leave the firm.' As sur[e]ly you [Miller] know that was not the case." (Id. ¶ 17.) Miller replied that she understood that Guterman's decision was important, and that "Tuesday morning would be fine but let us know by then." (Id. ¶ 18.)

Guterman scheduled a meeting with Jeff Hurd, then Head of Asset Management Disposition for AIG, for Tuesday and another meeting with Danielsson for Wednesday. (Id. ¶ 20.) The parties contest the nature and purpose of these meetings. On Monday, September 21, AIG re-coded Guterman in its HR records as having transferred to a new position. (Id. ¶ 19.) Guterman asserts, and AIG disputes, that on Tuesday, September 22, Guterman met with Hurd, who assured him that he would look into Guterman's situation. (Id. ¶ 21.) On Wednesday, September 23, Miller emailed Guterman at 7:57 a.m. to tell him that HR would "be processing

your separation from the company effective today." (Id. ¶ 22.) According to Guterman, when he responded that he had a meeting later that day with Danielsson, Miller told him that there was nothing Danielsson could do, that it was "over," and that he had to vacate the building and return his ID and other company property. (Id. ¶ 23.) Guterman submits that, when he asked Miller what this separation meant for his severance benefits, she told him that he "should" be covered under the ESP. (Id. ¶ 25.) The ESP and the CMRC deny that Miller made any such representation. (Pl./Counter-Def.'s and Cross-Def.'s Answer ¶ 25.)

On September 29, 2009, Guterman emailed AIG's CEO, arguing that he should be entitled to ESP benefits by reason of the termination of his former position and that, in view of the diminution of responsibilities and compensation association with the Head of Retail position, the restructured position was not a "bona fide job offer." Acknowledging the Plan terms concerning resignations, Guterman asserted that "[t]he sole purpose of this [Head of Retail] offer is to satisfy the ESP clause resignation for good cause is not a covered termination and therefore deny me termination benefits." (Pl.'s Ex. 2.) Guterman submitted a claim for severance benefits to the Plan on October 22, 2009. (ESP 56.1 Stmt ¶ 26.) In March, 2010, Guterman was notified that his claim had been denied by the Plan's Claims Administrator. (Id. ¶ 27.) The Claims Administrator found Guterman's refusal to accept the role of Head of Retail Sales to be a resignation and, therefore, to be a non-covered termination under the terms of the Plan. (Id.) Guterman appealed the decision of the Claims Administrator to the CMRC in May 2010. (Id. ¶ 28.) The CMRC upheld the Claims Administrator's decision denying Guterman severance benefits. (Id. ¶ 31.) In its written decision, the CMRC stated that "Mr. Guterman repeatedly was offered, in writing, the new role with AIG Investments . . . it was his decision as to whether to stay with the company. Ultimately, Mr. Guterman refused to accept the new role

and, therefore, the company processed his separation. . . . Mr. Guterman's termination of employment was, therefore, a resignation rather than a Covered Termination under the ESP." (Id. ¶ 33.) The CMRC found that Guterman was not covered by the Good Reason provision since he was not a Senior Vice President. (Id. ¶¶ 34-36.) Accordingly, any contention that the change in responsibilities and compensation constituted a "constructive discharge" was ineffective to render Guterman's separation a Covered Termination within the meaning of the Plan. (Id.)

Guterman asserts that AIG was under significant pressure from the federal government and the public at large to limit its executives' severance packages after the company received an estimated $182.3 billion in government financial support from 2008 to 2009. (Guterman 56.1 Resp. Stmt ¶¶ 27-29, 33.) AIG received negative press and an admonishing letter from United States Senator Charles Grassley after providing its former General Counsel with a multi-million dollar severance package in the end of 2009. (Id. ¶ 29.) The CMRC's members were aware of this pressure and were told by AIG's in-house counsel to provide a "fair interpretation" of the ESP's terms, but given no additional or specialized training, when considering his severance claim. (Id. ¶¶ 33-34.)

After receiving the CMRC's decision affirming the Claims Administrator's denial of severance benefits, Guterman informed the ESP that he planned to pursue his severance claims by initiating an arbitration action before the Financial Industry Regulatory Authority ("FINRA"). (Compl. ¶ 20.) In response, the ESP brought this action seeking a declaratory judgment in its favor.

## DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (the moving party bears the burden of establishing that there is no genuine issue of material fact). A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson, 477 U.S. at 248). "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002).

Standard of Review

A deferential abuse of discretion standard is applied where, as here, the plan administrator or other fiduciary is given discretion under the plan's terms to determine eligibility for benefits. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008) "[A] court may not overturn the administrator's denial of benefits unless its actions are found to be arbitrary and capricious, meaning without reason, unsupported by substantial evidence or erroneous as a matter of law." McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 132 (2d Cir. 2008) (internal quotation marks and citations omitted). "'Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" Kellner v. First Unum Life Ins. Co., 589 F. Supp. 2d 291, 307 (S.D.N.Y. 2008) (quoting Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003) (internal quotation marks omitted)). "Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be

allowed to control." McCauley, 551 F.3d at 132 (internal quotation marks and citations omitted).

In actions under ERISA § 502(a)(1)(B), courts are to consider conflicts of interest when assessing whether a plan fiduciary has abused its discretion when determining eligibility for benefits. Specifically, "[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008) (internal quotation marks and citations omitted) (emphasis in original). A conflict of interest exists "where it is the employer that both funds the plan and evaluates the claims." Id. at 112. In such circumstances, "[t]he employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary. Thus, the employer has an 'interest . . . conflicting with that of the beneficiaries,' the type of conflict which judges must take into account when they review the discretionary act of a trustee of a common law trust." Id. (citations omitted). Such a conflict is one of "several different considerations" that are weighed in determining whether discretion has been abused, "any one [of which] will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." Id. at 117.

Guterman argues that the CMRC's decision to deny his claim for severance benefits was arbitrary and capricious and was not based on "substantial evidence." Guterman disputes the CMRC's determinations that he resigned from AIG by refusing the accept the Head of Retail Sales role and that, as a result, he did not experience a Covered Termination under the terms of the ESP. Guterman argues that he did not at any point resign, but rather was in the

midst of negotiations with Bridge and AIG about whether to accept the new role or leave with severance when the firm unilaterally decided to terminate him. Disclaiming any reliance on a theory of constructive discharge or the idea that he was covered by the ESP's "Good Reason" clause,[3] Guterman argues that he did not resign and therefore experienced a Covered Termination for which he should receive severance. Guterman further argues that the CMRC was subject to the structural conflict of interest identified by the Glenn Court (i.e., employer as claims fiduciary and payor), that this conflict of interest was exacerbated by the adverse attention of the news media and government, and that the conflict lead to an arbitrary and capricious denial of severance benefits. The Court has considered these matters in making its determination as to whether the denial of ESP benefits to Guterman was arbitrary and capricious.

Language of the ESP

Both the March 10, 2010, denial of Guterman's claim for severance benefits by the Claims Administrator and the CMRC's December 6, 2010, affirmance of that denial by the Plan Administrator note that the plain terms of the ESP do not cover resignations and constructive discharges for persons in Guterman's employment position. (Bernstein Decl. Ex. 1 at 2; Ex. 4 at 3; Ex. 9(1) at 4.) Both also determined that the Plan's "Good Reason" provision, which could apply in situations where an employee declines to accept a new position on the basis of diminution of duties and reduced compensation, was inapplicable to Guterman. These determinations are entirely consistent with the plain language of the Plan. The Claims Administrator and the CMRC further determined that Guterman's termination was the result of

---

[3] As noted above, the Plan provides that a resignation for "Good Reason" may be a covered termination in the case of persons at the Senior Vice President level and above. Guterman was not a Senior Vice President.

his resignation and thus was not a Covered Termination entitling Guterman to receive ESP benefits. This determination was supported by substantial evidence and was neither without reason nor erroneous as a matter of law.

The record demonstrates that Guterman was given a deadline, which was extended, within which to accept the Head of Retail position or resign. He did not accept the position by the extended deadline. Furthermore, Guterman told Neuger and Miller that he was uninterested in the position of Head of Retail Sales, and repeatedly declined to accept this new position with Bridge. These circumstances provide a sufficient factual basis for the CMRC's determination that Guterman resigned his employment with AIG. His efforts to negotiate a better offer and to seek coverage under the ESP do not render arbitrary, erroneous or unreasonable the determination that his failure to respond with an acceptance by the stated deadline constituted a decision to terminate his employment with AIG in the only position that was then available to him. Even where there is more than one reasonable interpretation of the facts and the terms of a plan, the Court must uphold a reasonable interpretation applied by a plan administrator under the arbitrary and capricious standard. See Celardo, 318 F.3d at 145-46. Having considered carefully the administrative record, the evidentiary proffers, and the language of the Plan, the Court finds that CMRC's decision was based on substantial evidence, was reasonable, and was not arbitrary and capricious.

Nor do the structural conflict of interest and Guterman's proffers as to external pressure to avoid severance payments warrant a finding that the denial of benefits to him was arbitrary and capricious. Even taking as true Miller's alleged statement that AIG wanted to be able to report the denial of benefits to a senior executive, the CMRC's interpretation of the Plan and benefit decision are consistent with the Plan's terms and the facts, supported by substantial

evidence and well within the range of reasonable decisions. Under the deferential standard applicable to review of this benefit determination, it must be upheld.

Citing 29 U.S.C. § 1132(g), the Plan requests that the Court award it reasonable attorneys' fees and costs incurred in connection with this action. That section provides in pertinent part that, "In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C.A. §1132(g)(1) (West 2009). The Plan brought this action in its own name, invoking the Declaratory Judgment Act rather than ERISA's civil action provisions. Because this is not an action brought under ERISA by a participant, beneficiary or fiduciary, and because the equitable factors properly taken into account in circumstances in which § 1132(g)(1) apply do not favor an award here,[4] the Plan's request is denied.

## CONCLUSION

Accordingly, the ESP's motion for summary judgment is granted and Guterman's claims against the ESP and the CMRC are dismissed.

---

[4] The traditional test within the Second Circuit for whether to award attorney's fees under § 1132(g)(1) considers the following factors: "(1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants." Chambless v. Masters, Mates & Pilots Pension Plan, 815 F.2d 869, 871 (2d Cir. 1987). Following Hardt v. Reliance Standard Life Ins. Co., 130 S. Ct. 2149 (2010), a court "may apply – but is not required to apply – the Chambless factors in channeling its discretion when awarding fees under § 1132(g)(1)." Toussaint v. JJ Weiser, Inc., 2011 WL 2175987, *2 (2d Cir. June 6, 2011) (internal quotation marks and citations omitted). There is no indication that Guterman pursued his claim in bad faith (and thus there is no need for deterrence); Guterman's position, while ultimately unsuccessful, is not so devoid of merit as to be frivolous; and no common benefit to plan participants is implicated.

This Memorandum Opinion and Order resolves docket entry no. 3.

The Clerk of Court is directed to enter judgment accordingly and close this case.

SO ORDERED.

Dated: New York, New York
September 13, 2011

_____
LAURA TAYLOR SWAIN
United States District Judge